CITY BANK (JAUDON v.). See Case No. 7,230.

CITY BANK (UNITED STATES v.). See Case No. 14,796.

CITY BANK (WILSON v.). See Case No. 17,797.

CITY BANK OF NEW YORK v. YONGE. See Case No. 2,739.

---

## Case No. 2,736.

CITY BANK OF COLUMBUS v. BEACH et al.

[1 Blatchf. 425.] [1]

Circuit Court, N. D. New York. Oct. Term, 1849.

POWERS OF BANKING CORPORATION—RESTRICTION AS TO LOCATION AND BUSINESS.

1. Where a banking corporation, whose location and place of business was at Columbus, Ohio, had power by its charter to deal in bills of exchange, without restriction as to place: *Held,* that it could purchase such bills at Cleveland, Ohio, for the purpose of remitting to New-York the proceeds of paper belonging to the bank, collected at Cleveland.

2. And it could even deal generally in exchange at Cleveland, through an agent there, with the funds thus collected and remitted.

3. The cases of Bank of Augusta v. Earle, 13 Pet. [38 U. S.] 519, and of Tombigbee R. Co. v. Kneeland, 4 How. [45 U. S.] 16, quoted and approved.

4. The City Bank of Columbus, under the acts of Ohio incorporating it, passed March 17, 1838. and March 6, 1845, and under the general banking law of Ohio, passed February 24, 1845, is restricted to Columbus as its location and place of business. (Per Conkling, J.)

Assumpsit, tried before Mr. Justice Nelson and Judge Conkling, in October. 1847, at Albany. The action was against the acceptors, on two bills of exchange. each for $1000, drawn by one Haskell, at Cleveland, Ohio, on the defendants, William Beach & Co., at Auburn, New-York, and accepted by them, payable at the office of H. Dwight, Jr., in New-

---

[1] [Reported by Samuel Blatchford, Esq., and here reprinted by permission.]

York, to the order of and endorsed by Haskell; one dated October 27th, 1845, and payable 63 days after date; the other dated November 12th, 1845, and payable 45 days days after date. The plaintiffs were a banking corporation incorporated by the state of Ohio, and having their banking-house and place of business at Columbus in that state. They became a corporation under three several acts of the legislature of Ohio: 1st. "An act to incorporate the Mechanics' Saving Institution of Columbus, Ohio," passed March 17th, 1838; 2d. "An act to incorporate the State Bank of Ohio, and other banking companies," passed February 24th, 1845; 3d. "An act to amend the act entitled 'An act to incorporate the Mechanics' Saving Institution of Columbus, Ohio,' passed March 17th, 1838," passed March 6th, 1845. The first act contained nothing fixing, in terms, the location of the corporation; but the first section of it incorporated certain persons "by the name and style of the 'Mechanics' Saving Institution of Columbus.'" The third act converted the "Mechanics' Saving Institution of Columbus," incorporated by the first, into a banking company, under the name of the "City Bank of Columbus." The first section of that act enacted: "That the Mechanics' Saving Institution of Columbus shall be held and adjudged a banking company within the meaning of the act entitled 'An act to incorporate the State Bank of Ohio and other banking companies,' passed February 24, A. D. 1845, and as such shall be entitled to receive from the treasurer of state circulating notes, and issue the same, and to transact banking business during the term, under the conditions, and subject to the limitations, restrictions and liabilities prescribed by said act relating to independent banking companies;" and, by the third section, the governor, upon being satisfied that the new corporation had complied with certain conditions, was, by proclamation, to declare the company to be "entitled to receive and issue notes for circulation, and to transact business as an independent banking company, subject in all respects to the provisions of the act incorporating the State Bank of Ohio and other banking companies." The capital of the new bank was fixed at not less than $75,000, nor more than $150,000. Among the powers granted expressly to independent banking companies by the act of February 24th, 1845, was the power to "buy, sell and discount bills of exchange." Section 51. That act provided prospectively for the voluntary formation of banking companies; divided the state, by counties, into twelve districts; limited the number of companies that might be formed in each district and in each county, and the aggregate capital of those formed in each district; prescribed the maximum capital for each 'ank; and fixed the aggregate capital of all the banks authorized by the act to be formed, at the maximum of $6,150,000, but that sum was not to be "construed to in-

clude the capital stock of such companies as, by name, shall be authorized to continue or to resume the business of banking, subject to the provisions of this act;" all which provisions were to apply to the new banks, whether organized as independent banking companies, or as branches of the State Bank of Ohio. Sections 1–4. By sections 68 and 69, certain banks therein named were authorized to re-commence and continue the business of banking subject to the provisions of the act. The certificate of association of each bank was to specify, among other things, "the name of the city, village, or town, in which its banking operations shall be carried on," and the companies were "authorized to commence and carry on the business of banking at the places severally designated in their certificates of association." Sections 7, 11. On the trial, the defendants proved, by one Morrison, that he received the two bills of exchange in question from Haskell, the drawer, in Cleveland, about the times they respectively bore date; that he discounted them both as the agent of and for the plaintiffs, and paid the proceeds to Haskell, in Cleveland; that the proceeds so paid were funds in his hands, belonging to the plaintiffs; that he, (the witness,) was the agent of the plaintiffs in Cleveland, and kept an office in Cleveland in which he conducted the business of such agency, for the purpose of collecting bills; that the nature of that business was, that the plaintiffs sent to him, for collection, their business paper discounted by them, and when he collected it he invested the proceeds, as their agent, in bills of exchange on New-York and elsewhere; that he bought bills to remit the funds; that sometimes the plaintiffs sent him mutilated circulating notes issued by other banks, for him to procure their redemption by those banks, and to invest the proceeds, as their agent, in the purchase of bills on New-York, which he had done; that they had also sent him, not more than once or twice, their own circulating notes, with which he had purchased bills of exchange on New-York; that he also sold, at Cleveland, as the plaintiffs' agent, bills of exchange on New-York and elsewhere, such bills being drawn by him as the plaintiffs' agent, on their funds; that he did anything with the funds of the plaintiffs in his hands that they thought proper; that he sent to New-York for collection the bills purchased by him, and kept an account in New-York as such agent; that, when he sold exchange on New-York, he re-invested the proceeds in other bills payable there; that he kept, at his agency in Cleveland and as such agent, separate books of account, in which the business of his agency was entered, and in which collections made and monies received for the plaintiffs were entered; that his standing orders from the plaintiffs' cashier were, to purchase bills, for the purpose of remitting to New-York all the funds he had of theirs in his hands; that he

would not say, but he thought he paid Haskell the amount of the proceeds of the two bills, out of the proceeds of paper collected for the plaintiffs; that he did not know as he had, at the time he purchased the two bills, any funds of the plaintiffs in his hands, other than the proceeds of collections; and that the average amount of funds of the plaintiffs in his hands, to be employed in purchasing exchange on New-York, was about $30,000. It also appeared that Columbus was in Franklin county, in the 5th district as established by the act of February 24th, 1845, and that Cleveland was in Cuyahoga county, in the 12th district. The defendants' counsel requested the court to charge the jury, that the plaintiffs were not entitled to recover on the two bills so purchased by them, as testified to by Morrison, in the general course of his business as their agent; that the plaintiffs had no right, under the laws of Ohio before recited, to establish an agency in Cleveland, and to carry on, through such agency, the kind of business conducted by Morrison as their agent, and that the purchase by Morrison of the two bills, with the funds of the plaintiffs, and for them, and under the circumstances testified to by him, was unlawful and in violation of the said laws of Ohio, and against their policy. The court refused so to charge, but charged the jury that the plaintiffs had acquired a valid title to the bills in question, and had not in such acquisition violated any public law of Ohio, and were therefore entitled to recover. The defendants' counsel excepted to the refusal and charge, and the jury found for the plaintiffs. The defendants now moved for a new trial, on a bill of exceptions.

Alvah Worden, for defendants.

I. Under the act creating the plaintiffs a banking company, and the act incorporating the Mechanics' Saving Institution, the plaintiffs are a corporation located, for the purpose of doing business, in the city of Columbus. Ang. & A. Corp. (2d Ed.) c. 13, 368; 2 Inst. 703, index "Inhabitant;" People v. Trustees of Geneva College, 5 Wend. 219. II. The plaintiffs, being a banking company located and established in Columbus, within the 5th banking district of Ohio, could not, under the laws of Ohio, conduct or carry on any kind of banking business in Cleveland, in the 12th district. Pennington v. Coxe, 2 Cranch [6 U. S.] 33; Griswold v. National Ins. Co., 3 Cow. 96; Crocker v. Crane, 21 Wend. 211. III. If the plaintiffs had no power to discount the bills in Cleveland, they acquired no title to them by the act of discounting them there. State v. Granville Alex. Society. 11 Ohio, 1; Bank of Augusta v. Earle, 13 Pet. [38 U. S.] 587; Runyan v. Lessee of Coster, 14 Pet. [39 U. S.] 122; Lessee of Knowles v. Beaty [Case No. 7,-896]; New York Firemen Ins. Co. v. Ely, 2 Cow. 678, and 5 Conn. 560; Life & Fire Ins.

Co. v. Mechanic Fire Ins. Co., 7 Wend. 31; Perkins v. Savage, 15 Wend. 414; New Hope & D. Bridge Co. v. Poughkeepsie Silk Co., 25 Wend. 650; North River Ins. Co. v. Lawrence, 3 Wend. 482; Head v. Providence Ins. Co., 2 Cranch [6 U. S.] 127; Beaty v. Lessee of Knowler, 4 Pet. [29 U. S.] 152; Beatty v. Marine Ins. Co., 2 Johns. 109; People v. Utica Ins. Co., 15 Johns. 358; De Groot v. Van Duzer, 17 Wend. 170, and 20 Wend. 390; New York Firemen Ins. Co. v. Sturges, 2 Cow. 675; Goszler v. Corporation of Georgetown, 6 Wheat. [19 U. S.] 597; Slark v. Highgate Archway Co., 5 Taunt. 792; Broughton v. Salford Water-Works, 3 Barn. & Ald. 1. IV. Nor did they acquire any title to the bills, if by the laws of Ohio they were prohibited from establishing an agency and discounting the bills at Cleveland. Holman v. Johnson, Cowp. 341; Parsons v. Thompson, 1 H. Bl. 322; Armstrong v. Toler, 11 Wheat. [24 U. S.] 258; Langton v. Hughes, 1 Maule & S. 593; Biggs v. Lawrence, 3 Term. R. 454; Pennington v. Townsend, 7 Wend. 281; Bank of U. S. v. Owens, 2 Pet. [27 U. S.] 527; Thalimer v. Brinkerhoff, 20 Johns. 397. V. The plaintiffs transferred a portion of their capital to Cleveland, and employed it there in the business of banking. They thus violated the laws of Ohio, and the bills were discounted without authority. People v. Utica Ins. Co., 15 Johns. 386; King v. Nicholson, 1 Strange, 299; Sharp v. Speir, 4 Hill, 83. VI. The court erred in instructing the jury that the plaintiffs were entitled to recover, and had not, in acquiring title to the bills, violated the law of Ohio. VII. Even if the case did not authorize the court to charge the jury as requested by the defendants' counsel, it presented a question for the jury, and it should have been left to them to say, under proper instructions, whether the plaintiffs had transferred their capital or any portion of it to Cleveland, to be employed in the business of banking, and, if so, whether, in the prosecution of such business, they had discounted the paper in question.

William H. Seward and Stephen A. Goodwin, for plaintiffs.

I. The purchase of the bills in question, by Morrison, as the plaintiffs' agent and at Cleveland, was a valid and legal transaction. 1. No place of business or location was prescribed for the plaintiffs by the laws of Ohio which have been cited, and they were not restricted to any particular place for doing their business. 2. Even though the plaintiffs may have been required to keep at Columbus their office for the redemption of their notes and the transaction of their ordinary banking business, yet they had a right to purchase bills of exchange, without restriction as to place, and to employ agents for the purpose. 3. The purchase of bills of exchange was no part of their banking business strictly. Swan's St. Ohio, 136; Bank of Augusta v. Earle, 13 Pet. [38 U. S.] 563. 4. The trans-

action in question must be judged by itself, as an individual one, and, in this view, it is abundantly sustained upon authority. Bank of Augusta v. Earle, Id. 519; Tombigbee R. Co. v. Kneeland, 4 How. [45 U. S.] 16; People v. Brewster, 4 Wend. 498; Potter v. Bank of Ithaca, 5 Hill, 490, and 7 Hill, 530; Suydam v. Morris Canal & Banking Co., 5 Hill, 491, note a, and 6 Hill, 217. II. The legal title to the bills is in the plaintiffs, and they show a legal right to recover upon them, which the defendants cannot defeat by showing that they have forfeited their charter, even if that were true. 1. The paper is on its face business paper, accepted by the defendants, and, by legal inference, upon funds of the drawer in their hands. 2. The defence is not that the paper was void in its concoction, and the defendants being ex aequo et bono liable to pay it, it does not lie in their mouths to say that they will not pay their just debts on the ground that the plaintiffs had no power to buy exchange at Cleveland. That is a question between the plaintiffs and the government only. Little v. O'Brien, 9 Mass. 422. 3. The paper being negotiable paper, which they are liable to pay at all events to some one, it is immaterial who sues it. Mauran v. Lamb, 7 Cow. 174; Gage v. Kendall, 15 Wend. 640; Watervliet Bank v. White, 1 Denio, 613. III. The defendants' counsel, at the trial, presented the whole question to the court as a question of law, and did not ask to have it put to the jury as a question of fact, whether the plaintiffs had transferred their capital to Cleveland.

NELSON, Circuit Justice. The acts under which the bank became a corporation, conferred upon it the power to deal in exchange, without restriction, and hence the purchase of bills at the city of Cleveland, for the purpose of remitting the proceeds of paper belonging to the bank collected at that place, or even the dealing generally in exchange at that place by an agent, with the funds thus collected and remitted, was not in contravention of the charter of the bank, or of any law of the state of Ohio. I think this case falls within the principle of the cases of Bank of Augusta v. Earle, 13 Pet. [38 U. S.] 519, and of Tombigbee R. Co. v. Kneeland, 4 How. [45 U. S.] 16, and that a new trial ought not to be granted.

CONKLING, District Judge. If, according to the true interpretation of the plaintiffs' charter, it in fact conferred on them no power to purchase bills of exchange at the place and in the manner stated in the bill of exceptions, then it follows that no title was in this instance acquired in virtue of such purpose, which can be enforced in a court of justice. It was from their charter that the plaintiffs, as a body corporate, derived their existence and their capacity to make contracts of any kind, and it is to this, therefore, that recourse must be had to ascertain the limits of their

capacity, and thus to determine whether or not it extended to the contracts in question.

It is conceded that the plaintiffs had the power, granted to them by their charter, of buying and selling bills of exchange. But it is insisted by the defendants' counsel that, under this general grant of authority, the plaintiffs had no right to establish an agency for the purpose of dealing in bills of exchange, and by that means to carry on that business elsewhere than at Columbus, in the manner they are described by the witness Morrison to have done at Cleveland.

In answer to this objection it is argued in behalf of the plaintiffs, in the first place, that they are not by their charter restricted to Columbus as the place at which their franchise is to be exercised; but that they are at liberty to establish their bank at any place in the state of Ohio. This proposition, I think, cannot be maintained. It is essential to the convenience and security of the public that every bank should have a fixed, known and permanent place of business, where it is bound to fulfil all its engagements, and where those who have dealings with it may safely resort for the purpose of fulfilling theirs. Bank charters, moreover, are not granted for the benefit of stockholders, but for the sake of those engaged in the productive and in mercantile pursuits; and, though a bank may be wanted at one place, it may be unnecessary at another. Persons who apply to the legislature for a banking charter always deem it necessary, therefore, to designate the place at which it is proposed to establish their bank, and to set forth the need of banking facilities at that place; and a charter is granted or withheld according to the opinion of the legislature, respecting the truth or sufficiency of such representations. It may, I imagine, be safely added also, that bank charters are never intentionally granted with power to the corporators to select, ad libitum, their place of business. The legislature of Ohio, by the act of February 24th, 1845, evinced a strong degree of solicitude on this very point. The design of that act was to supersede the necessity of special legislation for the purpose of establishing banks from time to time, at places where they might be required, by providing prospectively for the voluntary formation of banking associations. But in order, as far as possible, to secure a proper distribution of these institutions, the act divides the state into twelve districts, and prescribes the maximum amount of banking capital which may be employed in each, and the maximum number of banks which may be established, not only in each of these districts, but also in each of the counties of which they are composed. It is true that the City Bank of Columbus was not formed under this act, nor did the act restrain the legislature of Ohio from disregarding its policy, by incorporating a bank ten days afterwards without a local habitation. But it is

very improbable that this was intended to be done. A saving institution had already for several years been in being, carrying on its business, it is presumed, as its name indicates, at the city of Columbus. This institution, by the act of March 6th, 1845, was converted into a bank, under the name of the City Bank of Columbus, and unquestionably, without any intention of authorizing a change of location. But, in reality, this question is of little importance, for the bank was in fact established at Columbus, and it would be idle to assert that the corporation had a right at the same time to set up another bank at Cleveland. It is equally clear, also, that the legislature intended to place this bank, when organized, on the same footing in all respects as the "independent" (in contradistinction to the "branch") banks to be found under the act of February 24th, 1845. This design, indeed, appears to be sufficiently declared in the first and third sections, above recited, of the act of March 6th, 1845. It is very unlikely, moreover, that it should have been intended so soon to innovate upon a system so elaborately devised as that established by the preceding general act. The contrary presumption derives additional strength from the solicitude manifested in the 68th and 69th sections, by the inducements they hold out to bring the existing banks therein named under the provisions of the act.

It follows, therefore, that the question before the court depends upon the same principles that would govern it, if it concerned a bank formed under the general banking act of Ohio, instead of one owing its existence to a separate statute. This point, however, appears to me to be less important than it seemed to be considered by the counsel at the argument. It is true, the act of February 24th, 1845, evinces an anxious desire to secure a proper distribution of banking capital among the several districts and counties of the state; and it requires the several associations which may be formed under it, to designate beforehand the particular place at which they propose to establish their bank, and, having done so, limits them thenceforth to the place selected. But, it is to be recollected, that the act provides for the establishment from time to time of a great number of banks, without any further exercise of legislative discretion; and I am unable to discern in the scheme of distribution adopted, anything more than an attempt to do at once, prospectively, what the legislature would otherwise have been required to do by successive acts—that is to say, to adapt the supply of bank facilities in different parts of the state, to the exigencies of each, as far as they could be foreseen. Viewed in this light, those provisions of the act upon which so much stress was laid, ought to have no influence on the decision of the question before the court; for they impose no restrictions with respect to locality,

not usually imposed by separate acts of incorporation, and import no state policy affecting the rights of the plaintiffs.

The question, then, is resolved into the simple inquiry whether a state bank, having power by its charter to deal in bills of exchange, without any express restriction as to place, can lawfully establish an agency, for the purpose of buying and selling bills of exchange, in a part of the state other than that of its location. It was argued, indeed, by the plaintiffs' counsel, that the purchases of these two bills of exchange, coming as they do separately before the court, are to be regarded as isolated acts, and, as such, free from objection, whatever might be thought of the right of plaintiffs to establish an agency at Cleveland for the purpose of dealing in exchange. But these purchases were shown by the witness Morrison to constitute parts of a series of similar acts, performed by him as the agent of the plaintiffs, by them constituted for this express purpose; and to adjudge all these acts to be severally lawful, and admit them at the same time to have been collectively contrary to law, would seem to be inconsistent. But, whether they are to be considered individually or collectively, unless it can be shown that a bank may lawfully do without, what it cannot lawfully do within the limits of the state whence it derived its corporate existence, the question before the court has already been authoritatively answered by the supreme court of the United States, in the cases of Bank of Augusta v. Earle, 13 Pet. [38 U. S.] 519, and of Tombigbee R. Co. v. Kneeland, 4 How. [45 U. S.] 16. In the first of these cases the question was, whether a bank incorporated by the legislature of the state of Georgia, and established at Augusta in that state, having power conferred upon it in general terms by its charter to deal in bills of exchange, could lawfully buy bills of exchange in the state of Alabama, through an agent employed there for that purpose. The court decided that it could. The case was in all respects essentially like the present, except that in that case the bill of exchange on which the suit was founded, was purchased by the Georgia bank in another state, instead of a different place in the same state. The case decides, therefore, that if the City Bank of Columbus had employed its agent and purchased these bills at Mobile, instead of Cleveland, its title would have been indisputable. Is its title then to be held invalid, because the purchases were made within the limits of the state of Ohio?

A corporation is a legal entity, endowed with those faculties only with which the legislature have seen fit to invest it. The power to purchase bills of exchange is, by the statutes of Ohio, conferred on the plaintiffs, as it was by the statute of Georgia on the Bank of Augusta, in general terms,

without restriction as to place. If this grant imports a capacity to deal in exchange, through an agent appointed for that purpose, in other states, by what sound principle of construction can it be maintained, that the grant confers no power to do the same thing in any part of the state of Ohio? If, indeed, the statute, while conferring the power, had also, in terms, forbidden its exercise within the state of Ohio, elsewhere than at Columbus, it may be conceded that this action could not be maintained; and it would then be impertinent to inquire, whether, notwithstanding this restriction, the plaintiffs might not, according to the doctrine of the case of Bank of Augusta v. Earle [supra], lawfully send an agent into another state to purchase bills of exchange. But, in the absence of any such restriction, I am unable to distinguish the present case from that. Indeed the principal question in that case was, not whether the bank possessed a more extensive power to make contracts out of the state of Georgia than within it, but whether it had the capacity to contract beyond the limits of that state at all. The question turned upon the comity of nations, supposed to be recognized by the laws of the several states with respect to each other, and upon certain provisions contained in the constitution of Alabama. It was, however, deemed necessary, before proceeding to the consideration of these points, to determine first the extent of the power to deal in bills of exchange, conferred on the bank by its charter; for, said the chief justice, in pronouncing the judgment of the court, "it may be safely assumed that a corporation can make no contracts, and do no acts, either within or without the state which creates it, except such as are authorized by its charter; and those acts must also be done by such officers or agents, and in such manner as the charter authorizes." After laying down this fundamental principle, the court proceeded to observe: "The charter of the Bank of Augusta authorizes it, in general terms, to deal in bills of exchange, and consequently gives it the power to purchase foreign bills as well as inland—in other words, to purchase bills payable in another state; and the general power to purchase bills, without any restriction as to place, by its fair and natural import authorized the bank to make such purchases wherever it was found most convenient and profitable to the institution, and also to employ suitable agents for that purpose. The purchase of the bill in question was, therefore, the exercise of one of the powers which the bank possessed under its charter, and was sanctioned by the law of Georgia creating the corporation, so far as that state could authorize a corporation to exercise its powers beyond the limits of its own jurisdiction." Now, it seems quite clear from this language, that the general grant of power to deal in exchange, contained in the charter of the bank

of Augusta, was considered by the court sufficient to warrant the exercise of this power at any place within the state of Georgia, and that, if this had been found to be otherwise, all further inquiry would have been deemed unnecessary. But it is needless to dwell longer upon this point. All that was urged at the argument, to prove that the plaintiffs had unlawfully assumed to exercise their banking franchise through their agency at Cleveland, is fully answered by the case of Bank of Augusta v. Earle, and the other cases embraced in the same report; and especially by the subsequent case of Tombigbee R. Co. v. Kneeland, in which the doctrines of the former case were reasserted and more strongly applied.

My opinion, therefore, is, that the motion for a new trial ought to be denied.